J-A12017-21

2022 PA Super 149

| EASTERN STEEL CONSTRUCTORS, INC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| INTERNATIONAL FIDELITY INSURANCE COMPANY | |
| Appellee | No. 998 MDA 2020 |

Appeal from the Judgment Entered July 23, 2020
In the Court of Common Pleas of Centre County
Civil Division at No.: 2011-3233

| EASTERN STEEL CONSTRUCTORS, INC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| INTERNATIONAL FIDELITY INSURANCE COMPANY | |
| Appellant | No. 1034 MDA 2020 |

Appeal from the Judgment Entered July 23, 2020
In the Court of Common Pleas of Centre County
Civil Division at No.: 2011-3233

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

OPINION BY STABILE, J.:                    **FILED: SEPTEMBER 1, 2022**

In this suretyship action, Appellant/Cross-Appellee, Eastern Steel Constructors, Inc. ("Eastern" or "Claimant"), and Appellee/Cross-Appellant, International Fidelity Insurance Company ("IFIC"), appeal and cross-appeal, respectively, from the July 23, 2020 judgment entered in the Court of

Common Pleas of Centre County ("trial court"). Following the prime contractor Ionadi Corporation's ("Ionadi") failure to pay Eastern for work Eastern performed under a subcontract, Eastern sought to recover the outstanding payments from IFIC, Ionadi's surety. Eastern secured an arbitration award against Ionadi that was subsequently confirmed and reduced to a judgment. Thereafter, Eastern unsuccessfully attempted to collect the judgment from IFIC. Eastern filed suit and the case eventually proceeded to a jury trial, at the conclusion of which the jury returned a verdict in favor of Eastern and against IFIC. We now are called upon to decide, *inter alia*, whether a surety, who had notice of and an opportunity to participate in arbitration proceedings against its principal, is bound by an arbitration award rendered against the principal and, separately, whether a surety is subject to the bad faith statute, 42 Pa.C.S.A. § 8731. After careful review, we have concluded, *inter alia*, that IFIC, as surety, was bound by the arbitration award, but not subject to a bad faith action under Section 8731. Accordingly, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

## I.    BACKGROUND

In 2008, the Pennsylvania State University ("PSU") entered into a prime contract (the "Construction Contract") with Ionadi for the erection of steel on a project for the construction of the Millennium Science Center Complex at PSU's University Park Campus in Centre County, Pennsylvania (the "Project").

On October 29, 2008, IFIC issued a $10,125,000.00 payment bond ("Payment Bond") for Ionadi in connection with the Project.[1] To do so, IFIC utilized The American Institute of Architects ("AIA") standard form AIA Document A312, which the parties modified to suit their needs. In particular, the Payment Bond provided:

> 1. The Contractor[2] and the Surety[3], ***jointly and severally***, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner[4] to pay for **labor, materials and equipment furnished for use in the performance** of the Construction Contract[5], which is incorporated herein by reference.
>
> 2. With respect to the Owner, the obligation shall be null and void if the Contractor:
>
> > 2.1 Promptly makes payment, directly or indirectly, for **all sums due Claimants** . . . .
>
> 3. With respect to **Claimants**, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for ***all sums due***.
>
> 4. The Surety shall have no obligation to Claimants under this Bond until:
>
> > 4.1 Claimants who are employed by or have a ***direct contract*** with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent

---

[1] On the same day, IFIC also issued a performance bond for Ionadi relating to the Project, but that bond is not at issue in this appeal.

[2] Bond references to the "Contractor" are to Ionadi.

[3] Bond references to the "Surety" are to IFIC.

[4] Bond references to the "Owner" are to PSU.

[5] The "Construction Contract" under the bond is the prime contract between Ionadi and PSU.

a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

. . . .

6. When the Claimant has satisfied the conditions of Section 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the Claimant, with a copy to the Owner, within 60 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

6.3 The Surety's failure to discharge its obligations under this Section 6 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a claim. However, if the Surety fails to discharge its obligations under this Section 6, Surety shall indemnify the Claimant for the ***reasonable attorney's fees*** the Claimant incurs to recover ***any sums found to be due and owing*** to the Claimant.

9. The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are ***unrelated*** to the Construction Contract. . . .

. . . .

11. No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 . . ., or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs.

. . . .

15. **DEFINITIONS**

**15.1 Claimant**: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of [all utilities] . . . or rental equipment used in the Construction Contract, . . . and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

Payment Bond, 10/29/08, at 5-6 (emphasis added).

On November 11, 2008, Ionadi subcontracted (the "Subcontract") with Eastern, a family-owned commercial subcontractor, for installation services relative to the steel reinforcing material. Specifically, Eastern agreed to, among other things, "supply labor and trade hand tools for installation of prefabricated reinforcing steel." Subcontract, 11/11/08, at ¶ 1. For the reinforcing steel installation, the Subcontract set the unit price of structure rebar at $0.33/per pound. *Id.* The Subcontract also provided in pertinent part:

18. Payment schedules to [Eastern] will be made on or before the calendar 25th of each month, of an amount equal to 90% of the total value of work placed or performed during the preceding month. There will be a 10% retention holding. Retention release shall occur no later than 60 days after [Eastern's] reinforcing completion.

. . . .

19. [Eastern] shall receive a copy of all delivery tickets for all material which [Eastern] will be installing. With each delivery, a copy will immediately be issued to [Eastern] for its records, and all weights will be shown on delivery tickets from reinforcing suppliers.

. . . .

21. Rebar weights for payment to [Eastern], regarding installation, shall be actual bar weights as shipped, providing such weights are shipped for installation.

    . . . .

23. [Eastern] reserves the right to charge ***interest at one and one-half percent (1-1/2%) monthly*** on delinquent debt or payments, and to decline to perform any work except upon receipt of payment or security; or upon terms and conditions satisfactory to [Eastern].  **[Eastern] shall be considered a direct obligee of [Ionadi's] bond assuring this [Subcontract].** ***Any costs incurred, direct and indirect, for which [Eastern] is subjected in pursuing any money, or consequential damages, legal fees, and costs of any kind to [Eastern] for nonperformance, will be [Ionadi's] and [IFIC's] responsibility***.

    . . . .

25. **If any filing of claim, dispute, or legal actions are pursued and/or initiated against [Ionadi], such will occur and take place through means of the American Arbitration Association** [("AAA")] by means of binding arbitration within the nearest local jurisdictional boundaries, or city, in which the [P]roject is located.

*Id.* at ¶¶ 18-19, 21, 23, and 25 (emphasis added).

Thereafter, on November 25, 2008, Eastern separately entered into a written agreement with Tinney Rebar Services, Inc. ("Tinney"), a reinforcing supplier, for the fabrication and supply of the reinforcing steel for the Project. The Tinney agreement also contained an AAA arbitration provision.

A. *Payment Dispute*

On February 28, 2009, pursuant to the Subcontract, Eastern began handling and installing reinforcing steel, supplied to Ionadi by Tinney, at the Project.  Eastern concluded its work at the Project on September 4, 2010.

Eastern submitted requests for payment to Ionadi monthly by completing an AIA Application and Certification for Payment ("Payment Requests"). Each of the Payment Requests submitted by Eastern to Ionadi contained an invoice number, identified the amount of work performed within the covered time period, and listed the weight of reinforcing steel, among other things.

Ionadi paid Eastern on the first five Payment Requests for work performed at the Project through June 30, 2009. Thereafter, however, Ionadi either failed to pay the Payment Requests at all, or paid them only partially and late, citing cash flow problems.

On April 27, 2010, while work at the Project was ongoing, Eastern notified IFIC in writing of a claim under the Payment Bond for nonpayment of $622,182.90 by Ionadi. Eastern stated:

> [Ionadi] is in default of payments due and owing to [Eastern], which Eastern is demanding payment by you as the surety co-obligor[.] . . . [Ionadi] has admitted they have received payments that should have been forwarded to Eastern, however, due to their financial problems they have not. [Eastern] demand[s] prompt payment plus legal and statutory interest paid to Eastern.

Letter, 4/27/10. On April 29, 2010, IFIC notified Eastern that IFIC did not have sufficient information to determine whether all or any portion of the alleged amounts due was undisputed or disputed under the Payment Bond. *See* Letter, 4/29/10. IFIC directed Eastern to complete a proof of claim form. *Id.* On May 5, 2010, Eastern complied, submitting the required proof of claim to IFIC in support of its April 27, 2010 claim for nonpayment by Ionadi for

services it rendered on the Project. IFIC denied Eastern's claim on June 17, 2010. *See* Letter, 6/17/10. Eventually, however, IFIC reversed course and made payments to Eastern. On August 23, 2010, IFIC issued a check to Eastern for $277,295.00. Later, IFIC issued another check for $172,080.00 to Eastern on December 23, 2010. In the aggregate, Eastern received $944,277.52 for its work on the Project. Eastern, however, claimed that, exclusive of interest, attorneys' fees, costs, expenses and penalties, Eastern still was due $253,788.08 for its work on the Project.

B. *Arbitration and Bankruptcy*

On November 29, 2010, consistent with the Subcontract's AAA arbitration provision, Eastern filed a demand for binding arbitration against Ionadi. Eastern contacted and notified IFIC of the arbitration, but IFIC declined to participate. In September 2010, Tinney, Ionadi's reinforcing steel supplier who also had not been paid by Ionadi, filed a civil complaint against IFIC in the Court of Common Pleas of Allegheny County. IFIC filed preliminary objections, compelling Tinney to arbitrate its claims against Ionadi because Tinney's subcontract with Ionadi contained an AAA arbitration provision. Tinney subsequently in July 2011, filed a demand for arbitration and its arbitration was subsequently consolidated with Eastern's. As a condition for joining Eastern's arbitration proceeding, Tinney advised IFIC in writing of the proposed joinder, and like Eastern, invited IFIC to participate directly in the arbitration. IFIC once again declined. The joint arbitration hearing began on October 5, 2011, and Ionadi, despite having continual notice of the scheduled

arbitration hearing, elected not to participate therein. In spite of Ionadi's absence, the arbitrator required Eastern and Tinney to present their cases.

On the day arbitration began, Ionadi filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Western District of Pennsylvania at case number 11-26204-TPA. On October 6, 2011, the arbitrator suspended the arbitration hearings pending efforts of Eastern's and Tinney's counsel to obtain a lift of the automatic stay of claims against Ionadi from the bankruptcy court. IFIC, despite notice, did not attend a hearing before the bankruptcy court to contest Eastern's motion to lift stay. On October 7, 2011, Eastern's and Tinney's counsel returned to the arbitrator's office from the bankruptcy court and advised the arbitrator that the bankruptcy court had issued an order lifting the automatic stay. *See* Arbitration Award, 11/9/11, at 1. As a result, the arbitration hearings proceeded to conclusion. *Id.* On November 9, 2011, the arbitrator awarded Eastern $433,489.42 under the Subcontract,[6] which included the $253,788.08 Eastern claimed it was owed by Ionadi under the Subcontract for the work it performed at the Project. *Id.* at 2. Additionally, the arbitrator directed Ionadi to reimburse Eastern for $19,933.94 in arbitration fees and expenses. *Id.* Neither Ionadi nor IFIC sought to vacate the arbitration award.

---

[6] The award included: $92,830.52 for outstanding contract balance, including retainage; $87,823.06 for extra work; $73,132.14 for bulletin work; $68,299.08 for interest and penalties through November 9, 2011; and $111,404.62 in attorneys' fees.

On February 9, 2012, the bankruptcy court held a hearing on Eastern's motion for relief from the automatic stay to determine whether to lift the stay so that Eastern could proceed to confirm the arbitration award. Despite attending the hearing, IFIC did not object to Eastern's motion. The bankruptcy court ultimately granted relief and lifted the automatic stay. **See** Bankruptcy Order, 2/10/12, at 1-2.

Eastern then petitioned the Court of Common Pleas of Allegheny County to confirm and enter judgment on the arbitration award pursuant to Section 7342(b) of the Uniform Arbitration Act, 42 Pa.C.S.A. § 7342(b).[7] In July 2012, the trial court confirmed the award, and judgment was entered in favor of Eastern and against Ionadi.[8] Even though IFIC's counsel attended the proceedings, **see** Reproduced Record (R.R.) at 120a, neither IFIC nor Ionadi appealed the judgment. Eastern unsuccessfully attempted to collect the judgment from IFIC.

C. _Centre County Action_

On August 1, 2011, Eastern brought the instant Centre County action against IFIC under Section 11 of the Payment Bond by filing a writ of

---

[7] Section 7342(b) provides that "[o]n application of a party made more than 30 days after an award is made by an arbitrator under section 7341 (relating to common law arbitration), the court shall enter an order confirming the award and shall enter a judgment or decree in conformity with the order." 42 Pa.C.S.A. § 7342(b).

[8] The Allegheny County court specifically noted in its order that it was "not making any findings or conclusions as to the _res judicata_ or preclusive effect of the award of arbitration or any confirmation or judgment derived therefrom as against IFIC or any other party." Order, 7/23/12 (emphasis in original).

summons.  On November 7, 2011, Eastern filed a complaint against IFIC, which it amended on November 14, 2011.  In its amended complaint, Eastern asserted multiple claims against IFIC.  Count 1: breach of contract; Count 2: breach of contract (third party beneficiary); Count 3: action in assumpsit/civil action under the Public Works Contractors' Bond Law of 1967, 8 P.S. § 191 *et seq.*; Count 4: indemnification; Count 5: breach of contract (enforcement of arbitration award); Count 6: action in assumpsit/civil action under the Public Works Contractors' Bond Law (enforcement of arbitration award); Count 7: bad faith under 42 Pa.C.S.A. § 8731; and Count 8: promissory estoppel. Following the overruling of preliminary objections, on April 9, 2012, IFIC answered the amended complaint, denying the averments of the complaint and asserting new matter.  Eastern replied to IFIC's new matter on May 24, 2012.

On March 11, 2013, IFIC filed a "Motion for Partial Judgment on the Pleadings or, in the Alternative, Certification of Issues for Interlocutory Appeal."  IFIC sought dismissal, as a matter of law, of Count 5 (breach of contract – enforcement of arbitration award), Count 6 (action in assumpsit – enforcement of arbitration award), and Count 7 (bad faith), claiming that IFIC, as Ionadi's surety, was not bound by the arbitration award and the judgment thereon.  In support, IFIC reasoned that there was no statutory predicate or case law in Pennsylvania that would obligate it to pay an arbitration award rendered against its principal and in favor of a subcontractor in an *ex parte* proceeding to which IFIC was not a party.  In other words, IFIC argued that it

was not a party to the Subcontract containing the AAA arbitration provision and it did not participate in the resulting arbitration proceedings at which Ionadi failed to defend itself. Thus, according to IFIC, it was not liable to pay the arbitration award, as confirmed and reduced to judgment. With respect to Count 7, IFIC argued that Eastern's claim for bad faith was not cognizable against a surety and, therefore, should be dismissed as a matter of law. IFIC reasoned that there was no authority to support Eastern's claim that a surety contract constituted an insurance policy within the meaning of Section 8371.[9]

On March 22, 2013, while IFIC's motion for partial judgment on the pleadings was pending, Eastern filed a motion for partial summary judgment with respect to Counts 1 through 3, 5, and 6 of the amended complaint. Eastern's summary judgment motion was premised, *inter alia*, on its contention that IFIC was indeed bound by the arbitration award and that, as a result, the award should be enforced against IFIC. Eastern based its summary judgment motion in large part on certain admissions made during the deposition testimony of Kathleen Maloney, IFIC's senior claims representative and admissions in IFIC's answer to the amended complaint.

Thereafter, on April 4, 2013, Eastern responded to IFIC's motion for partial judgment on the pleadings, asserting that IFIC was bound by the arbitration award entered against Ionadi. Eastern reasoned that IFIC, as a

---

[9] Section 8371 provides in part that it is applicable only "[i]n an action arising under an **insurance policy**[.]" 42 Pa.C.S.A. § 8371 (emphasis added). We discuss Section 8371 in more detail, *infra*.

- 12 -

co-obligor, was in privity with Ionadi and had notice of, and opportunity to participate in, the arbitration proceedings. Eastern claimed that "Ionadi, as well as co-obligor IFIC, had received advance notice, [and Ionadi] had responded to the demand for arbitration and participated in conferences with the arbitrator prior to the arbitration proceedings." Answer to Motion for Partial Judgment on Pleadings, 4/8/13, at ¶ 4. Specifically, Eastern countered that it "notified IFIC of the filing of its demand for arbitration, and noticed IFIC when each breach was ripe, and on several occasions invited any claims agent of IFIC as an original promisor pursuant to the [Payment Bond] to intervene in the arbitration." *Id.* at ¶ 6. Eastern further claimed that IFIC attended proceedings in Allegheny County on Eastern's petition to confirm and enter judgment on the arbitration award. *Id.* at ¶ 5. With respect to IFIC's contention that Eastern's bad faith claim should be dismissed, Eastern responded that the surety risk undertaking was insurance.

On August 27, 2013, the trial court issued an order on IFIC's motion for partial judgment on the pleadings and Eastern's motion for partial summary judgment. The court granted IFIC's motion for partial judgment to the extent IFIC sought certification for an interlocutory appeal. The trial court, however, denied IFIC's motion insofar as it sought the dismissal of Counts 5 and 6, concluding that IFIC was bound by the arbitration award entered against Ionadi and that IFIC chose not to participate in the arbitration, despite notice and opportunity. Trial court Opinion, 8/27/13, at 7-8. The court found that "the arbitration award entered against Ionadi is 'at least *prima facie* evidence

against [IFIC]." *Id.* at 8. The trial court denied the motion with respect to the dismissal of Count 7, bad faith, concluding that the issue had to be further litigated. With respect to Eastern's motion for partial summary judgment, the trial court ordered the disposition thereof be held in abeyance in light of its decision to certify for interlocutory appeal issues raised in IFIC's motion for partial judgment on the pleadings. *Id.* at 10-11.

IFIC subsequently petitioned this Court for permission to appeal from the trial court's August 27, 2013 order. We, however, denied relief. *See Eastern Steel Constructors, Inc. v. Int'l Fid. Ins. Co.*, No. 81 MDM 2015 (Pa. Super. filed November 8, 2013). On January 22, 2014, the trial court denied Eastern's motion for partial summary judgment. In so doing, the court again reasoned in part that "the arbitration award entered in favor of [Eastern] and against Ionadi is *prima facie* evidence against IFIC. Trial Court Opinion, 1/22/14, at 5. The court determined that the arbitration award was not conclusive evidence against IFIC, and the issue would need to be more fully developed at trial. *Id.*

On December 22, 2014, Eastern renewed its motion for partial summary judgment based on IFIC's subsequent answers to interrogatories and subsequent document production. On February 4, 2015, the trial court denied the motion.

On March 9, 2015,[10] IFIC filed a motion *in limine*, seeking to exclude evidence of the arbitration award and the resulting judgment. The trial court, despite its prior rulings, granted the motion, explaining without citation to any legal authority:

> Ever mindful of the previous rulings of this [c]ourt, after thorough examination of the Pennsylvania authority, it is clear in this case that [Eastern] may not rely upon, and not even introduce, the outcome of the arbitration process. Our fundamental tenants of due process require that before the [c]ourt will accept and rule on evidence against any party, that the party has every opportunity to challenge, and to test, that evidence. Here, that has not been the case. [Eastern] urges that IFIC was on notice that the arbitration was to be conducted, but there were conditions and restrictions placed on IFIC that inclined IFIC to not participate. No contractual obligation bound [IFIC] to arbitrate, and no role was played by [IFIC] in the selection of the Arbitrator. Furthermore, no evidence was introduced or challenged by [IFIC] during the arbitration process. In fact, this [c]ourt is not aware that [IFIC] knows anything more about the arbitration than is contained in the two-page Award dated November 9, 2011.
>
> Equally as significant to this [c]ourt is the fact that [IFIC] cannot be made to stand in the shoes of [Ionadi], as all evidence is that Ionadi essentially rolled over for the entry of a "Default Award" against them. This [c]ourt cannot fathom a trial strategy and delivery which is available to [IFIC] that would allow it to effectively demonstrate to any jury that the Award of the Arbitrator was incorrect, inflated, or in any way improper. If the Award is introduced to the jury, [IFIC] would be limited to the barest of collateral attacks on the court-sanctioned citadel of the arbitration. That outcome offends every sense of due process known to Pennsylvania law.
>
> The unique facts of this case, together with a dearth of applicable case law upon which to rely, leave this [c]ourt only to retreat to the foundational principles of the law. There it finds no basis for

---

[10] The *in limine* motion was faxed to and received by the trial court on March 6, 2015, but docketed on March 9.

allowing [Eastern] to introduce the Award which would conclusively prejudice the open minds of any jury toward the outcome determined by the Arbitrator. [IFIC] would be left without any realistic opportunity to scrub that conclusion from the jurors' minds.

Trial Court Opinion, 3/9/15, at 1-2. This order was a marked departure from the court's previous rulings on this issue.

On March 10, 2015, the matter proceeded to a jury trial, where Eastern attempted to introduce into evidence a white binder full of Tinney's delivery tickets that, according to IFIC, previously had not been produced in discovery or identified as trial exhibits. On March 11, 2015, the trial court recessed the trial to permit IFIC time to review the Tinney documents and conduct additional discovery. *See* Trial Court Order, 3/11/15. On March 16, 2015, the trial court issued an order reserving for trial the issue of attorneys' fees under Section 6.3 of the Payment Bond. *See* Trial Court Order 3/16/15. The court explained that it would be able to determine at trial whether IFIC failed to discharge its obligations under the Payment Bond. *Id.*

On May 7, 2015, IFIC moved for partial summary judgment as a matter of law with respect to Counts 4 and 7 of the amended complaint. Eastern, in Count 4, sought recovery for attorneys' fees and costs under Section 6.3 of the Payment Bond and Count 7, as noted earlier, was the bad faith claim. Eastern's claims for indemnification and bad faith centered on IFIC's alleged failure to promptly and timely comply with the requirement of Section 6 of the Payment Bond. In support of its summary judgment motion, IFIC argued that the evidence "demonstrates an absence of any genuine issue of material fact

as to IFIC's compliance with Section 6 of the [Payment] Bond." IFIC Summary Judgment Motion, 5/7/15, at ¶ 7. Subsequently, the trial court declared the previously commenced jury trial to be a mistrial when Eastern dismissed its counsel. *See* Trial Court Order, 6/1/15.

Following a hearing, the trial court granted IFIC's motion for partial summary judgment. With respect to Count 4, the trial court concluded that IFIC satisfied its obligations under Section 6 of the Payment Bond by investigating "the claim promptly and notif[ying] Eastern [] within sixty days that it was disputing the entire amount of the claim due to lack of sufficient documentation to substantiate the claim[.]" Trial Court Opinion, 10/15/15, at 5-6. This ruling was a reversal of its March 16, 2015 order on this issue. On the bad faith claim (Count 7), the trial court revisited its prior rulings and concluded that Section 8371 "was not intended to include surety bonds." *Id.* at 7.

On September 21, 2016, IFIC filed a motion *in limine* to exclude delivery tickets. In particular, IFIC challenged the admissibility of Tinney's delivery documents that had been proffered during the March 2015 trial. IFIC contended that the delivery tickets were inadmissible because they were irrelevant, could not be authenticated properly, and constituted hearsay. Following a hearing, on April 11, 2017, the trial court denied the motion. The court concluded that the delivery tickets were relevant insofar as they created a presumption that the rebar delivered to the Project by Tinney was shipped for installation. Moreover, the court determined that the delivery tickets were

self-authenticating documents and satisfied the business records exception to the rule against hearsay. **See** Trial Court Opinion, 4/11/17, at 5.

On August 4, 2017, Eastern filed a motion *in limine* regarding the arbitration award and resulting judgment. Eastern argued that, despite the trial court's ruling that the arbitration award should not be shown to the jury, Eastern—to prove its claims—had to "introduce evidence and argue in the presence of the jury about matters relating to the arbitration **other than the result**, including Eastern's initiation of arbitration against Ionadi, the conduct of the arbitration and the fact that the arbitration proceeded to a result." Eastern's Motion *In Limine*, 8/4/17, at ¶ 9 (emphasis added). On the same day, Eastern also filed a motion *in limine* to exclude expert testimony of Jim Bertoline on the amount of rebar installed at the Project. After yet another hearing, the trial court granted Eastern's motion on September 21, 2017. The court explained that Eastern's motion *in limine*

> seeks clarification of this [c]ourt's ruling barring reference to the arbitration award. At trial, [Eastern] wishes to inform the jurors that an arbitration took place, as arbitration is required by the contract between [Eastern] and Ionadi. [Eastern] believes that if this fact is wholly excluded from trial, the jurors may believe that [Eastern] did not abide by the contract.
>
> Although the [c]ourt agrees that excluding all mention of the arbitration could cause jurors to speculate, the [c]ourt also recognizes that allowing the parties to reference the outcome or the conduct at arbitration would likely prejudice the minds of the jurors. Therefore, the [c]ourt will draft a brief statement to be read by the [c]ourt during the trial which will address the binding arbitration clause of the [Subcontract].

Trial Court Opinion, 9/21/17, at 3. Accordingly, the trial court ordered that it would provide the following instruction to the jury:

> There has been testimony relating to a [Subcontract] between [Eastern] and [Ionadi]. One provision of this contract requires disputes between the parties to be resolved through binding arbitration. I am instructing you now that [Eastern] has fully complied with the arbitration provision. You are not to use this information for any purpose other than to decide whether Eastern has met its obligations under the [Subcontract].

*Id.* at 5.[11] On the issue of expert testimony, the trial court concluded that Mr. Bartoline's testimony was relevant to present IFIC's theory of payment to Eastern—that is, the amount of rebar installed at the Project instead of the amount of rebar shipped. *Id.* at 2-3. The court, therefore, denied Eastern's motion on this issue.

At some point in 2018, the trial judge, Judge Thomas King Kistler, retired from the bench and this matter was reassigned to Judge Brian K. Marshall. On August 17, 2017, Eastern sought reconsideration of the trial court's March 9, 2015 order issued by Judge Kistler, granting IFIC's motion *in limine* seeking to exclude evidence of the arbitration award and judgment thereon. On December 10, 2018, the trial court (Judge Marshall) denied Eastern's reconsideration motion. The court concluded that it was divested of jurisdiction to entertain the motion because it was patently untimely.

---

[11] The trial court clarified that its March 9, 2015 order remained in effect and, as a result, the parties were prohibited from introducing evidence from the arbitration, the arbitration award, or the final judgment.

Furthermore, the trial court determined that the coordinate jurisdiction rule,[12] which provides that judges of coordinate jurisdiction should not overrule each other's decisions, prevented it from revisiting Judge Kistler's March 9, 2015 order and that Eastern failed to establish an exception to that rule. **See** Trial Court Opinion, 12/10/18, at 2-5.

The parties thereafter filed additional motions *in limine*,[13] which the trial court, following a hearing, disposed of on February 3, 2020. First, relying on its September 21, 2017 ruling, the trial court denied Eastern's motion with respect to the amount of rebar installed. The trial court then denied, for a second time, IFIC's *in limine* motion relating to delivery tickets, concluding the issue previously was litigated and decided on April 11, 2017. The trial court also denied IFIC's motion *in limine* to preclude prejudgment interest, concluding that in the event of a jury verdict in favor of Eastern, Eastern was entitled to prejudgment interest from the time it notified IFIC of Ionadi's default—that is May 5, 2010—until the time of mistrial, which occurred on May 28, 2015. The court concluded that any delay in proceeding to trial since May 28, 2015 was mostly attributable to Eastern. **See** Trial Court Opinion, 2/3/20, at 14. The trial court lastly denied IFIC's *in limine* motion seeking to limit

---

[12] **See Zane v. Friends Hospital**, 836 A.2d 25, 39 (Pa. 2003) (explaining that the coordinate jurisdiction rule "provides that judges of coordinate jurisdiction should not overrule each other's decisions.").

[13] Eastern sought to exclude evidence relative to the amount of rebar installed, and IFIC again sought to exclude the delivery tickets, preclude recovery of prejudgment interest, and limit Eastern's recovery.

Eastern's recovery. IFIC argued that during the aborted March 10, 2015 trial, Eastern's President Judith Striebinger stated that the total amount due to Eastern was $220,029.09. *Id.* at 14. Yet, as IFIC pointed out, during a subsequent pretrial statement, dated March 11, 2019, Eastern claimed it was owed $253,758.72. *Id.* IFIC asked the court to consider as a judicial admission the testimony of Ms. Striebinger and bind Eastern thereto. Eastern countered that because Ms. Striebinger had not been cross-examined, her statement on the amount owed should not be viewed as a judicial admission. The trial court agreed, concluding that her testimony was incomplete and offered during an aborted trial. *Id.* at 15-16.

Retrial commenced on February 24, 2020 and, following close of the evidence, the trial court, among other things and without any objection, instructed the jury on the nature of suretyship as follows:

> In this case, [Ionadi] and IFIC are separate legal entities who entered into a surety contract. A surety contract is a direct and original undertaking under which the surety provider, IFIC, is **primarily and jointly liable** with the principal, Ionadi. The liability of IFIC as surety is **coextensive with that of Ionadi** as principal. And accordingly, the surety, IFIC, is bound to perform whatever may be legally required of its principal, Ionadi.

N.T., Trial, 2/26/20, at 201 (emphasis added). The jury found in favor of Eastern. *Id.* at 213. On the verdict slip, the jury answered "no" to the question of whether Eastern was paid in full by Ionadi under the Subcontract for Eastern's work on the Project. *See* Verdict Slip, 2/27/20, at ¶ 1. Having answered "no," the jury then proceeded to the second and final question on

the verdict slip, which required the jury to state the amount of money that Eastern was entitled to be paid for its work, over and above the amount that Eastern already has been paid. The jury determined that amount to be $253,788.06, which essentially mirrored the damages claimed under the Subcontract and awarded in arbitration. *Id.* at ¶ 2.

On March 2, 2020, IFIC filed a motion for post-trial relief, which it amended on March 9, 2020. On March 6, 2020, Eastern also moved for post-trial relief and sought to mold the verdict to include prejudgment interest. Following a hearing, the trial court denied the parties' respective post-trial motions on July 1, 2020, but on July 17, 2020, molded the verdict to $330,427.70, reflecting an award of prejudgment interest of six percent (6%) per annum from May 5, 2010 until May 28, 2015.[14] On July 23, 2020, the molded verdict was reduced to judgment in favor of Eastern. The parties timely cross appealed.[15] On September 9, 2020, the trial court directed the parties to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Both parties complied. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion.

## II.   DISCUSSION

On appeal, Eastern presents the following issues for our review.

---

[14] This reflected a decrease of $103,061.42 from the November 9, 2011, arbitration award.

[15] On September 11, 2020, we *sua sponte* consolidated Eastern's appeal docketed at 998 MDA 2020 and IFIC's cross-appeal docketed at 1034 MDA 2020.

I.      As to the AAA arbitration award and judgment obtained by Eastern against . . . Ionadi, did the trial court commit an abuse of discretion and/or error of law as it relates to the following:

    a. Granting IFIC's motion *in limine* to preclude entry into evidence the arbitration award at time of trial.

    b. Ruling that the arbitration award and judgment were not binding and conclusive upon IFIC.

    c. Refusing to allow into evidence exhibits of the arbitration award and entry of judgment obtained against [Ionadi].

    d. Fail[ing] to give a jury instruction that the arbitration award and judgment obtained against [Ionadi] was conclusive as against [IFIC].

II.     Did the trial court commit an abuse of discretion and/or error of law by granting IFIC's motion for partial summary judgment and thereby denying Eastern the right to collect attorney's fees and costs required by the [Subcontract]?

III.    Did the trial court commit an abuse of discretion and/or error of law by instructing the jury that it could not award counsel fees to Eastern as required by the [Subcontract]?

IV.     Did the trial court err in limiting Eastern's prejudgment interest to 6% and ignoring the [Subcontract's] provision for 18% interest?

V.      Did the trial court commit an error of law and/or abuse of discretion in granting partial summary judgment as to Eastern's bad faith claim?

Eastern's Brief at 7-8 (unnecessary capitalizations omitted).

On cross-appeal, IFIC argues only that the trial court misinterpreted "the payment terms of [the Subcontract] for steel reinforcing material installation services to permit [Eastern] to recover payment for quantities of steel

- 23 -

reinforcing material without introducing any evidence of 'actual bar weights as shipped.'" IFIC's Brief at 3.

A.    *Eastern's Appeal*

      1.    *The Effect of the Arbitration Award Upon IFIC As Surety*

We begin by addressing Eastern's first claim on appeal, consisting of multiple subparts, raised principally within the context of the trial court deciding motions *in limine*, by answering the following question, as the answer to this question will be dispositive of the remaining subparts.  Whether IFIC, as surety under the Payment Bond, is bound by an arbitration award entered and reduced to judgment against its principal, Ionadi, when IFIC, as surety, had full knowledge of the proceeding and an opportunity to participate in and defend against the arbitration claims.

With respect to motions *in limine*, our standard of review is well-settled.

> A motion *in limine* is used before trial to obtain a ruling on the admissibility of evidence.  It gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury.  A trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review.

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion.  An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

> In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Parr v. Ford Motor Co.***, 109 A.3d 682, 690-691 (Pa. Super. 2014) (citations omitted), ***appeal denied***, 123 A.3d 331 (Pa. 2015), ***cert. denied***, 136 S. Ct. 557 (2015).

Eastern argues that the trial court abused its discretion in prohibiting it from introducing and admitting at trial evidence of the arbitration award and the resulting judgment. Eastern contends that the arbitration award rendered in its favor was conclusive and enforceable against IFIC. Thus, according to Eastern, the jury should have been made aware of its existence. We agree.

We begin our analysis by examining the terms of the Payment Bond and Subcontract. Under the terms of the Payment Bond, IFIC as surety, and Ionadi as Contractor and Principal, *jointly and severally*, bound themselves to PSU to pay for all labor, materials, and equipment furnished for use in performance of the Construction Contract. Payment Bond ¶ 1. Under this provision, both Ionadi and IFIC agreed to be individually and/or jointly responsible for the entire payment obligation. Accordingly, anyone claiming payment from Ionadi could pursue payment in a joint action against Ionadi and IFIC, or by separate actions against any one of them.[16] With respect to the Owner, the bond obligation would be deemed null and void if Ionadi made payment, directly or indirectly, for all sums due Claimants. ***Id.*** at ¶ 15.

---

[16] Black's Law Dictionary defines "[J]oint and several liability" as "[l]iability that may be apportioned either among two or more parties or to only one or a few select members of the group, at the adversary's discretion." *Black's Law Dictionary* (11th ed. 2019).

"Claimants" are defined under the Payment Bond to include anyone, like Eastern, who has a direct contract with Ionadi.

With respect to "Claimants", the Payment Bond separately provides that any obligation to make payment under the bond will be deemed null and void if the Contractor promptly makes payment, directly or indirectly, for **all sums due**. **Id.** at ¶ 3. Because the Payment Bond does not define "all sums due" to a subcontractor, logically, all sums due by necessity must be determined under the terms of the Subcontract that detail the work to be performed by a subcontractor and how it is to be paid. To this end, the Subcontract confirms that Eastern, as a subcontractor to Ionadi, shall be a direct obligee of Ionadi's Payment Bond assuring the Subcontract. Subcontract at ¶ 23. As important, the Subcontract provides that any claim, dispute, or legal action between Eastern and Ionadi must be resolved by means of binding arbitration through the American Arbitration Association ("AAA") within the nearest jurisdictional boundary where the project is located. **Id.** at ¶ 25. Reading the Payment Bond and Subcontract together, it is clear that IFIC's liability for payment to Claimants, like Eastern, is co-extensive with that of Ionadi, its principal, to make payment to Eastern as provided for under the Subcontract, for work performed in connection with Ionadi's Construction Contract with PSU. The question presently is whether IFIC, as surety, is liable for all sums due to a subcontractor like Eastern, as determined by arbitration, the method made mandatory to resolve payment claims under the terms of the Subcontract.

Our research reveals that many cases that examined this issue begin with citation to the more than century old case of **United States ex. Rel. Fidelity Nat'l Bank v. Rundle**, 107 F. 227 (9th Cir. 1901). There, the court held that a judgment against the principal upon a bond is not admissible in evidence against a surety, except, first, in cases where the bond is conditioned to pay such judgment as may be rendered against the principal, and, second, as is pertinent here, in cases in which the sureties have had the opportunity to appear and defend in the action against the principal. **Id.** at 229. In Pennsylvania, the case of **Conneaut Lake Agricultural Association v. Pittsburgh Surety Company**, 74 A. 620 (Pa. 1909), precedent cited by Eastern and almost as old as **Rundle**, is consistent with the rule announced in **Rundle** that a judgment against the principal is admissible against a surety where the surety had the opportunity to appear and defend in the action against the principal.[17] **Conneaut Lake**, however, is more definitive as to the binding effect of a judgment entered against a principal on its surety. **Conneaut Lake** holds that an award entered against a contractor is **conclusive and binding** upon the surety where the surety was notified of

---

[17] Contrary to the trial court's statement that there exists a dearth of applicable case law upon which to rely on this issue, a substantial body of case law does in fact exist nationally that reveals a majority rule as to whether a surety is bound by an arbitration award entered against its principal. **See Arbitration and the Surety**, American Bar Association Book Publishing (January 1, 2020); Chapter 6, Res Judicata and Collateral Estoppel Effect Upon the Surety; 50 State Survey, Bryan and Springer.

the time and place of the arbitration hearing and chose not to appear and defend when it had the opportunity to do so.[18]

In **Conneaut Lake**, an agricultural association entered into contracts for construction of a race track. The plaintiff's contract for which the defendant contractor/principal provided surety required all disputes to be referred to a duly authorized and appointed arbitrator—an engineer—whose decision would be final and binding. **Id.** at 621-22. The surety was notified of the time and place of the arbitration hearing. **Id.** at 621. Despite this notice, neither the surety nor the contractor appeared for arbitration. **Id.** The arbitrator rendered an award in favor of the plaintiff, who subsequently brought suit to recover the amount awarded under arbitration from the surety. **Id.** The trial court found in favor of the plaintiff. On appeal, our Supreme Court rejected the surety's contention that it was not bound by the arbitration award. It reasoned:

> **The award was conclusive and binding upon it**. The appellant was notified of the time and place of hearing before the arbitrator. It did not, apparently, see fit to appear and defend when it had the opportunity to be heard. It is not now in a position to raise questions which if they had any merit should have been raised by its principals, the contractors, and which were clearly within the

---

[18] IFIC attempts to dismiss the precedential effect of **Conneaut Lake** upon the basis of its age and that the case has not since been cited by any Pennsylvania court. Brief for Appellee/Cross-Appellant at 34-35. Regardless, and more importantly, the holding in **Conneaut Lake** has not been overruled or disavowed by our Supreme Court and hence, remains good and binding law upon this Court. **See Commonwealth v. Millner**, 888 A.2d 680, 693 (Pa. 2005) (explaining that the jurisprudential task of the Superior Court is to effectuate the decisional law of the Supreme Court, not to restrict it through curtailed readings of controlling authority.).

> jurisdiction of the arbitrator chosen by the parties to the contract to decide all matters of difference between them connected in any way with the work.

*Id.* at 622 (emphasis added).

Here, as detailed earlier, Eastern exercised its rights under the Subcontract to collect the amounts due from Ionadi by proceeding to AAA arbitration. Consistent with the terms of the Subcontract, Eastern sought to recover contract damages, as well as attorneys' fees and interest as provided for under the Subcontract. The arbitrator rendered an award for $433,489.42 in favor of Eastern. The award included attorneys' fees, interest, and penalties, as provided for in the Subcontract. IFIC was aware of the arbitration and related proceedings at all times. Yet, IFIC failed to facilitate Ionadi's defense or participate in the arbitration despite invitation to do so.[19] Following the issuance of the arbitration award, neither Ionadi nor IFIC sought to vacate the award. *See Ass'n of Contracting Plumbers of City of New York, Inc. v. Loc. Union No. 2 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 841 F.2d 461, 466 (2d Cir. 1988) (holding that nonparties to arbitration may attack the award where the award "affects the [nonparties] in a sufficiently substantial and concrete matter"). Moreover, neither Ionadi nor IFIC objected—before the bankruptcy court—to Eastern's request to lift the

---

[19] Tellingly, IFIC compelled Tinney, the reinforcing steel supplier, to arbitration when Tinney had filed a civil action against Ionadi for nonpayment related to the Project in Allegheny County.

automatic stay so that Eastern could confirm the award. After the bankruptcy court granted relief to Eastern, Eastern petitioned the Allegheny County trial court to confirm the arbitration award and enter judgment thereon. Both Ionadi and IFIC participated in this proceeding. After the trial court confirmed the $433,489.42 arbitration award, inclusive of attorneys' fees, interest and penalties, and reduced it to judgment against Ionadi, neither Ionadi nor IFIC appealed the judgment. The record in this case, without any doubt, demonstrates that IFIC was kept appraised of all critical proceedings with respect to the arbitration and confirmation of the arbitration award and judgment rendered in favor of Eastern. Despite every opportunity to do so, IFIC intentionally chose not to participate in the arbitration or any other proceeding against its principal—Ionadi—for which it was jointly and severally liable for all sums due Eastern.

Under these circumstances, and consistent with **Conneaut Lake**, given IFIC's notice of and opportunity to participate in the arbitration proceedings that determined the sums due Eastern under its Subcontract, we agree that the arbitration award was enforceable against and binding upon IFIC who stood in the shoes of Ionadi, its defaulting principal. Our conclusion in this regard is consistent with most jurisdictions that hold a surety is conclusively bound by an arbitration award against its principal if the surety had notice and

a reasonable opportunity to participate in the arbitration.[20]  The trial court's grant of IFIC's *motion in limine* to preclude entry into evidence the arbitration award was an error of law.  The arbitration award entered in favor of Eastern and against Ionadi was entitled to be given binding and conclusive effect in Eastern's suit against IFIC.

We are aware of other authority that would render the arbitration award as only *prima facia* evidence against the surety.  **See P.R. Post Corp. v. Maryland Cas. Co.**, 271 N.W.2d 521, 525 (Mich. 1978); **Escambia Chemical Co. v. Rocker** , 184 S.E.2d 31, 36 (Ga. App. 1971); **Lake Cnty.**, **supra**; **Seaboard Surety v. Westwood Lake, Inc.**, 277 F.2d 397, 404 (5th

_____

[20] **See Rundle**, **supra**; **Arbitration and the Surety**, **supra** at n.17*; **See also Isidor Paiewonsky Assocs., Inc. v. Sharp Properties, Inc.**, 998 F.2d 145, 155 (3d Cir. 1993) (applying Pennsylvania law, the court held that an arbitrator's award was binding against a non-party whose interests were "directly related, if not in fact congruent" to those of a party in the arbitration proceeding); **Sheffield Assembly of God Church, Inc. v. Am. Ins. Co**., 870 S.W.2d 926, 932 (Mo. App. 1994); **Rashid v. Schenck Const. Co., Inc.**, 438 S.E.2d 543, 546-47 (W. Va. 1993); **U.S. for Use & Ben. of WFI Georgia, Inc., v. Gray Ins. Co.**, 701 F. Supp.2d 1320, 1329 (N.D. Ga. 2010); **Seaboard Sur. Co. v. Bd. of Chosen Freeholders of Warren Cnty.**, 537 A.2d 310, 314 (N.J. Super. App. Div. 1988); **Kidder Elec. of Fla., Inc. v. U.S. Fid. & Guar. Co.**, 530 So.2d 475, 476-77 (Fla. Dist. Ct. App. 1988); **U.S. ex rel. Frontier Constr., Inc. v. Tri-State Mgmt. Co.**, 262 F. Supp. 2d 893, 897 (N.D. Ill. 2003); **U.S. ex rel. MPA Constr., Inc. v. XL Specialty Ins. Co.**, 349 F. Supp. 2d 934, 942 (D. Md. 2004); **U.S. for Use & Benefit of Skip Kirchdorfer, Inc. v. M.J. Kelley Corp.**, 995 F.2d 656, 661 (6th Cir. 1993); **Fewox v. McMerit Constr. Co**., 556 So.2d 419, 425 (Fla. Dist. Ct. App. 1989), **Raymond Int'l Builders, Inc. v. First Indem. of Am. Ins. Co.**, 516 A.2d 620, 622 (N.J. 1986); **Frederick v. United States**, 386 F.2d 481, 485 n. 6 (5th Cir. 1967); **Lake Cnty. v. Massachusetts Bonding & Ins. Co.**, 75 F.2d 6, 8 (5th Cir. 1935); **Von Eng'g Co. v. R.W. Roberts Constr. Co.**, 457 So.2d 1080, 1082 (Fla. Dist. Ct. App. 1984); **First Mobile Home Corp. v. Little**, 298 So.2d 676, 682–83 (Miss. 1974).

Cir. 1960); *Hopkins v. Nat'l Sur. Co.*, 97 So. 297, 298 (La. 1923); *Becker v. Koza*, 53 F.R.D. 416, 421 (D. Neb. 1971). Before concluding otherwise, the trial court in this case as well, concluded that the arbitration award entered against Ionadi was at least *prima facia* evidence against IFIC. Trial Court Opinions, 8/27/13, at 7-8 and 1/22/14 at 5. The line of authority represented by these cases, as well as the trial court's earlier rulings, are inconsistent with our precedent. We reject their holding that an arbitration award may only be considered as *prima facia* evidence of the amount owed by a surety. Admitting an arbitration award as only *prima facia* evidence, as opposed to being conclusive and binding, does not give full effect to the finality objectives to be achieved by submitting claims to binding arbitration, a policy fully endorsed by our state and federal laws. *See Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490, 501-502 (Pa. 2016) (noting the federal policy favoring arbitration where arbitration agreements are valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract); *accord Provenzano v. Ohio Valley General Hosp.*, 121 A.3d 1085, 1096 (Pa. Super. 2015) (noting that Pennsylvania endorses the nationally liberal policy favoring arbitration agreements); *see also* 42 Pa.C.S.A. § 7303 ("A written agreement to subject any existing controversy to arbitration or a provision in a written agreement to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity relating to the validity, enforceability or revocation of any contract.").

A holding that only considers an arbitration award as *prima facia* evidence against a surety, impermissibly gives the surety, who stands in the shoes of its principal, a second bite at the proverbial apple to challenge sums due a claimant already determined under binding arbitration. **See Commonwealth v. Turner**, 17 A.2d 352, 354 (Pa. 1940) (noting a plaintiff should not be compelled to prove a second time facts upon which a surety's liability is predicated, facts which already have been established in an action against the principal). Nor do such holdings give full effect to the surety's obligation to be and remain jointly and severally liable for all sums due a bond claimant. Permitting a surety to require a claimant to litigate a second time those sums due from its principal essentially severs the joint and several liability aspects of a suretyship and destroys the coextensive contractual liability for payment that is the hallmark of a surety payment bond.

Indeed, it is long settled that a surety's liability for contract damages is coextensive with the liability of its principal. **See White v. Commonwealth**, 39 Pa. 167, 176 (1861) (noting that "the obligation of the surety was coextensive with that of his principal"); **see also Plummer v. Wilson**, 185 A. 311, 313 (Pa. 1936) ("We have often said that it is a fundamental incident of suretyship that upon default a surety and his principal are both primarily liable upon the original undertaking."). Where there is a surety relationship, an obligee is entitled to performance of a contractual duty by the principal or alternatively, if the principal defaults, by the principal's surety. **Kiski Area Sch. Dist. v. Mid-State Sur. Corp.**, 967 A.2d 368, 371–72 (Pa. 2008)

(citations omitted).  The surety stands in the shoes of the principal and must complete **any** obligation due the obligee at the time of default.  **Id.** at 372. It would be inconsistent to recognize that a surety is obligated to fulfill a principal's defaulted obligation, but at the same time hold that the surety is entitled to independently challenge that obligation after the sums due from its principal are established under binding arbitration to which it had ample notice and opportunity to participate in those proceedings.[21]

For the same reasons, we reject IFIC's opening position that since it is not a party to the Subcontract that compels arbitration between Ionadi and Eastern, it cannot be bound by an arbitration award against its principal.  The Third Circuit case of **Allstate Settlement Corp. v. Rapid Settlements, Ltd.,** 559 F.3d 164 (3d. Cir. 2009), cited by IFIC for the proposition that an arbitration award rendered in an arbitration between consenting parties cannot bind a party that had not agreed to arbitration, is clearly inapposite.[22] Although that case did recognize a number of exceptions under Pennsylvania law whereby non-signatories to an arbitration agreement may be bound by an arbitration award, the issue of a surety's liability for an arbitration award entered against its principal where the surety is jointly and severally liable

---

[21] The issue as to whether a surety may raise defenses personal to it in an arbitration proceeding and how that may affect its obligation to its principal is not presently before this Court.

[22] Similarly, we reject the trial court's view that IFIC cannot be bound to the arbitration award, since it was not a party to those proceedings, as that view ignores completely the terms of the Payment Bond, the Subcontract, and the inherent nature of a suretyship long established under our law.

with its principal was not within the facts before that court. In fact, that case did not concern a suretyship at all.

Citing **McIntyre Square Associates v. Evans**, 827 A.2d 446 (Pa. Super. 2003), IFIC nonetheless contends that the arbitration award can have no effect on it because the award was entered by default. We agree the case is instructive, but contrary to IFIC, we believe the case supports, rather than contradicts, our conclusion that the arbitration award here was conclusive and binding. In **McIntyre**, this Court was asked to address both procedural and substantive issues in an action against sureties on a commercial lease following the default of, and confession of judgment against, the tenant on the lease. The tenant, Professional Male, had executed a lease and a subsequent extension with the property management agent, First City, acting on behalf of the lessee McIntyre Square. The lease was guaranteed by various Professional Male owners, officers, and an owner spouse. When Professional Male defaulted on the lease, First City confessed judgment against Professional Male and then subsequently sought to enforce that judgement as binding and conclusive upon the guarantors. The trial court declined to give preclusive effect to First City's confessed judgment against Professional Male for First City's damages under the guaranty agreement, thus allowing the guarantors to re-litigate damages. After trial, the damages awarded First City were substantially less than those entered by confession. First City appealed.

To resolve whether the confessed judgment was conclusive as to the guarantors, we first distinguished the line of cases—belonging to a narrow

category of disputes concerning sureties on official or "good faith," bonds—upon which First City relied. Those bonds assure the performance of official or fiduciary duties and, regarding such bonds, we noted a long line of cases from this Commonwealth that support the contention a surety is bound by a determination of the principal's liability, a proposition not generally applicable to all sureties. *Id.* at 456.[23] Our review of extant cases, however, suggested that where a surety had *no right to defend*, as in the case of a confessed judgment, or potentially in the case of a default judgment, the judgment against the principal was not binding on the surety. *Id.* at 457. In particular, we noted the case of **Giltinan v. Strong**, 64 Pa. 242 (1870), wherein our Supreme Court held that a judgment recovered against a tenant for rent is not evidence against the surety on the lease where the surety *had no opportunity to defend*. **Giltinan** was cited later for support in **Thommen v. Aldine Trust Co.**, 153 A. 750 (Pa. 1931). There, the plaintiff and her husband jointly started a company. She left the company, and later sued her husband's estate to make payments guaranteed by him in the event the company defaulted on payments due under her noncompete agreement with the company. The Court held that she could not use her prior successful judgment against the company wherein the estate *had no notice or ability to defend*

---

[23] Sureties on official or fiduciary bonds are liable because, by the nature of the bond relationship, the sureties submit to the acts of the principal and to judgments against the principal. **McIntyre,** 827 A.2d at 457.

against the estate. **Thommen**, 153 A. at 752. Upon further review, we ultimately held that

> [E]xcept where the surety agreement concerns an official or other fiduciary bond, or where the agreement explicitly states otherwise, a default or confessed judgment obtained against the principal in the underlying action is not evidence of liability in an action against the surety, **unless, in the underlying action, the surety had an opportunity to defend**.

**McIntyre**, 827 A.2d at 459 (emphasis added). Because the guarantors did not have an opportunity to defend, we held that the trial court correctly prohibited the admission of the confessed judgment against Professional Male as evidence of the guarantors' liability in the action by First City against them.

In contrast to **McIntyre**, instantly, IFIC, as surety, was given every opportunity to defend against Eastern's claim for all sums due. It chose not to do so. On this critical fact, the result in **McIntyre** is distinguishable from the present case, but its statement that a default is not binding on the surety, unless the surety has an opportunity to defend, supports our conclusion that the arbitration award was conclusive and binding on IFIC. To the extent Eastern's arbitration award may be considered a default judgment against Ionadi,[24] we hold nonetheless, that it is conclusive and binding upon IFIC

---

[24] As the record reveals, although Ionadi participated in pre-trial conferences before arbitration it failed to appear for the proceedings. Nevertheless, the arbitrator required Eastern to set forth its proofs to establish Ionadi's liability for the sums claimed and awarded. Eastern thereafter petitioned the common pleas court to enter the arbitration award as a judgment against Ionadi. We
*(Footnote Continued Next Page)*

because IFIC was given every opportunity, as surety jointly and severally liable with Ionadi, to defend against Eastern's claim. Although not discussed by the **McIntyre** Court, coincidentally, the same result in fact was reached in **Conneaut Lake** where the surety was held liable for an arbitration award in favor of plaintiff and against the principal contractor where after notice, neither the contractor nor the surety appeared for arbitration.

IFIC lastly contends that the arbitration award cannot be enforced against it because its liability is not coextensive with that of Eastern. Specifically, IFIC contends that it is not liable for an award that included interest, penalties, attorney fees and arbitration costs, because those items are not expressly provided for under the Payment Bond that limits claims only to labor, material and equipment. Our review compels an opposite conclusion.

Although it is true that Section 1 of the Payment Bond provides that IFIC and Ionadi "jointly and severally" bind themselves to the Owner to "pay for labor, materials and equipment furnished for use in the performance of" the Contract, this same limiting language does not appear with respect to obligations due subcontractor Claimants like Eastern. Section 2 of the Payment Bond provides that with respect to the Owner, the bond obligation shall be deemed null and void if the Contractor "[p]romptly makes payment

---

need not resolve whether under these circumstances the arbitration award qualifies as a default judgment in light of our conclusion that the award is conclusive and binding upon IFIC as surety where it had every opportunity to defend against Eastern's claim.

. . . for **all sums due** Claimants[.]" Payment Bond, 10/29/08, at ¶ 2. With respect to Claimants, Section 3 of the Payment Bond obligates IFIC to make payments for "**all sums due**" Claimants, and if done so, the bond obligation shall be deemed null and void. Further support for the non-limiting language under Sections 2 and 3 is found within Section 9 of the Payment Bond that provides the Owner shall not be liable for payment of any costs or expenses of any Claimant under the bond, thereby suggesting that in addition to bonding labor, materials and equipment, costs and expenses may be within the surety's bonded obligations. In Pennsylvania, corporate surety bonds are construed strictly in favor of an obligee. **See Barratt v. Greenfield**, 9 A.2d 188, 189 (Pa. 1939) (noting that "in cases of corporate sureties the bond is to be strictly construed in favor of the oblige[e.]").

Regardless of how the various terms of the Payment Bond are reconciled, it is sufficient for our present purposes that Sections 2 and 3 of the Payment Bond obligate Eastern, and hence, IFIC as surety, to pay "all sums due" Claimants. By necessity, reference must be made to the Subcontract to determine what "sums due" are owed from Ionadi to Eastern, because the Payment Bond does not define the scope and manner of payment between Ionadi as the Contractor and Eastern as the subcontractor. While the Payment Bond assures the Owner payment will be made for all "labor, materials and equipment" for use in the Project, as stated earlier, the Payment Bond also separately provides that respect to Claimants like Eastern, the bond

obligation will be deemed null and void if Ionadi promptly makes payment, directly or indirectly, for "all sums due" to Eastern.

The question naturally arises whether a distinction should be drawn between Section 1 of the Payment Bond that assures the Owner that payment will be made for all "labor, materials and equipment", and Sections 2 and 3 that obligate Eastern and IFIC to promptly make payment to Eastern for all "sums due". We believe the answer to this question may in large part be answered by comparing the principal purposes for which an owner and a subcontractor are bonded.

Under our Mechanic's Lien Law of 1963 ("Lien Law"), 49 P.S. § 1101 *et seq.*, every improvement and the estate or title of the owner in its property is subject to a lien for the payment of all debts due by the owner to the contractor or by the contractor to any of his subcontractors for "*labor or materials furnished in the erection or construction, or the alteration or repair of the improvement.*" 49 P.S. § 1301.[25] Certainly, it is by no coincidence that Section 1 of the Payment Bond is written to protect an owner, such as PSU, from claims that may be lienable against its property under the Lien Law. This interpretation is consistent with Section 15 of the Payment Bond that expressly provides that the bond shall include without limitation in the terms

---

[25] Equipment reasonably necessary for performance of work is included within the definitions of "Contractor", "Subcontractor", "Materials", and "Erection, construction, alteration and repair" under the Lien Law. **See** 49 P.S. § 1201 (4) (5) (7) and (12), respectively.

"labor, materials or equipment", all other items for which a mechanic's lien may be asserted. Sections 2 and 3 however, assure payment for "all sums due" Claimants, which, by the breadth of this language, extends beyond those limited items that may be liened against an owner's property.[26] It makes commercial sense to include within "all sums due" to a subcontractor all amounts due under a subcontractor agreement. It is the subcontract that defines the scope and manner of payment between a contractor and its subcontractor. A subcontractor as well requires assurance of payment because it is not paid by the owner, but rather by the contractor who has contractual privity with the owner who provides payment for all work to the contractor.[27] A payment bond is meant to protect subcontractors from the risk of non-payment as well. The items for which a contractor must make payment to its subcontractors may not always be limited to those items that may be lienable against an owner's property. Therefore, we conclude that since Section 1 does not reference the same payment assurance language as Sections 2 and 3, that the bonded items under these provisions are not coextensive. While an owner's interest is protection against liens upon its

---

[26] We do not mean to imply that "all sums due" to a claimant never are the same as that for which an owner is bonded. A bond could be written to provide as much, and whether that is acceptable to a subcontractor is a matter left to the parties.

[27] This especially is so for a subcontractor in instances where a lien cannot be lodged against an owner if an owner already has made full payment to the contractor. *See* 49 P.S. § 1301(b) (a subcontractor does not have the right to a lien with respect to an improvement to a residential property if: (1) the owner or tenant paid the full contract price to the contractor.").

property, a subcontractor's interest is in getting paid as provided for under its subcontract. Our conclusion that "all sums due" to Eastern that are assured under the Payment Bond include those sums due under its Subcontract is supported further by our case law.

In ***Fort Pitt Bridge Works v. Continental Casualty Company***, 240 A.2d 493 (Pa. 1968), Fort Pitt Bridge Works delivered to A.J. Marsolino structural steel to be used by him in the erection of a bridge on a state highway.  Marsolino executed a labor and material bond in favor of the Commonwealth to secure payment of the materials furnished and prosecution of the work.  Continental Casualty Company was the surety on the bond.  Fort Pitt notified Continental that Marsolino defaulted in payment and then made demand on the surety for the amount due from Marsolino, including interest. When the surety refused, Fort Pitt sued in the name of the Commonwealth for the use of Fort Pitt.  At trial, a principal issue was whether Fort Pitt could collect from the surety the amount of interest that accrued prior to notice to the surety of any default by Marsolino.  The surety maintained the bond only covered amounts due for materials furnished by Marsolino and it could only be held liable for interest from the date demand was made against it for payment.  The trial court, however, held the surety liable for the entire amount due, including interest prior to notice and demand.  Our Supreme Court acknowledged that it might seem inequitable and harsh to compel the surety to pay for interest that accrued prior to receiving notice that its principal

defaulted, yet such was the obligation the surety contracted to assume.  The bond given by the surety in that case provided:

> The principal and surety hereby jointly and severally agree with the obligee herein that every person . . . who, whether as subcontractor or otherwise, has furnished material or supplied or perform labor or rental equipment in the prosecution of the work as above provided . . . and who is not been paid in full therefore, *may sue in assumpsit* on this Additional Bond . . . for **such sum or sums as may be justly due him**, them or it, and have execution thereon.

*Id.* at 369.  (Italics in original, emphasis added).  The Court held that the "sum justly due" Fort Pitt included all interest.  The interest was an integral part of Marsolino's debt for the material furnished, which material was covered by the bond.  The fact the bond did not specifically refer to interest was not controlling.  *What was controlling was that the surety agreed to make good the "sum justly due" by the defaulting principal.*  **Id.** at 370.  If the surety wished to curtail the amount of interest which would accrue, it easily could have inserted the requirement of notice of the principal's default in the bond.

**Fort Pitt** was followed in **Roman Mosaic and Tile Co. v. Carney**, 729 A.2d 73 (Pa. Super. 1999), wherein the surety argued that the trial court erred in awarding interest on the ground that the terms of its bond limited its obligation to "materials furnished, equipment or machinery rented, services rendered by public utilities, and labor supplied or performed in the prosecution of the work."  In rejecting this contention, we held that the surety's assertion ran counter to well-established case law.  Referencing **Fort Pitt**, we stated that where a surety bond permits recovery by a contractor for "such sums as

- 43 -

may be justly due," pre-judgment interest may be molded into a verdict. *Carney*, 729 A.2d at 79. The point being that assurance for payment for "all sums due" may be more expansive than just assurance for labor, material, and equipment.

In this case, IFIC's assurance to provide payment to Eastern for "all sums due" is to provide payment for all that is due under the Subcontract. Eastern's claim for interest, penalties, attorneys' fees, and arbitration costs are a part of "all sums due" as these items are included under paragraph 23 of the Subcontract. Specifically, Eastern reserved the right to charge interest at one and one-half percent (1½%) monthly and to recover any costs incurred, including any money, or consequential damages, legal fees, and costs of any kind to pursue Eastern for nonperformance.

Our conclusion also is consistent with analogous cases decided under the federal Miller Act,[28] that have held contractors and their sureties are obligated to pay amounts, such as interest and attorney fees, if such "sums due" are included within the subcontractor or supplier contracts. In *United States ex rel. Maddux Supply Co., v. St. Paul Fire Marine*, 86 F.3d 332, 334 (4th Cir. 1996), the general contractor Hill Construction Corp., was sued

---

[28] Under the Miller Act, 40 U.S.C. §§ 270(a), prime contractors for the construction, alteration, or repair of Federal buildings are required to furnish a payment bond for contracts in excess of $100,000. Other payment protections may be provided for contracts between $30,000 and $100,000. The payment bond is required as security for the protection of those supplying labor and/or materials in the construction of public buildings. *See* https://www.gsa.gov/cdnstatic/miller_brochure.pdf.

under the Miller Act by a supplier, Maddux Supply Co., relating to a construction project Hill performed for the federal government. Pursuant to the Miller Act, the supplier Maddux brought suit against Hill, Chapman Electric Co., the subcontractor to whom Maddox provided materials, and the surety St. Paul Fire and Marine Insurance Co., to collect the deficiency of what was still owed for materials supplied to Chapman and hence, the project. After a bench trial, the court ordered Hill and St. Paul to pay Maddux $30,225.66, plus interest and attorneys' fees. Hill and St. Paul appealed challenging, *inter alia*, the award of interest and attorney fees. The Fourth Circuit affirmed the award to include costs and attorneys' fees, even though the Miller Act, by its own terms, does not provide for these items. In affirming, the Court stated:

> Several circuits have held, however, that interest and attorney's fees are recoverable if they are part of the contract between the subcontractor and supplier. The rationale of those decisions—that attorney's fees and interest may be "**sums justly due**" under the Miller Act—is consistent with this court's rulings that contractors and their sureties are obligated to pay amounts owed by their subcontractors to suppliers. **Accordingly, if Maddux [supplier] was entitled to interest and attorney's fees under its contract with Chapman [subcontractor], it may recover interest and fees from Hill [contractor] and St. Paul [surety]**.

*St. Paul Fire Marine*, 86 F.3d at 336. (Citations omitted; emphasis added). Taken together, our precedent and analogous precedent fully support the assurance under the Payment Bond for interest and all costs incurred by Eastern, as provided for under the Subcontract, to pursue all sums due related to Eastern's performance under the Subcontract. If IFIC intended to limit

sums due under its Payment Bond, it could have done so, assuming any such limitation would not be contrary to applicable law.

In its October 15, 2015 opinion and order deciding IFIC's motion for partial summary judgment, the trial court, relying on its previous order of March 15, 2015,[29] citing **J.C. Snavely & Sons, Inc. v. Webb M&E, Inc.**, 594 A.2d 333 (Pa. Super. 1991), concluded that IFIC was not obligated to pay the 1.5% monthly interest charge contained in the Subcontract between Ionadi and Eastern because IFIC was not a party to that Subcontract. The court determined its conclusion was consistent with **In Reliance Universal, Inc. of Ohio v. Ernst Renda Contracting Co.,** 454 A.2d 39, 45 (Pa. Super. 1982), in which we observed that it is the language of the bond that determines the surety's obligations to a subcontractor and not the terms of the subcontract agreement. We find the trial court's reliance on **Snavely** and **Reliance** to be misplaced.

In **Snavely**, the subcontractor sought to recover from the contractor's surety finance charges and attorneys' fees as part of the "sums as may be justly due"[30] under the bond agreement. The bond defined a claimant as a subcontractor who provided labor, material or both for performance of the

---

[29] This order apparently was dictated into the record on the second day of the first trial that was aborted. **See** Trial Court Opinion, 7/1,20, at 3.

[30] Apparently not aware of our Supreme Court's decision in **Fort Pitt**, the **Snavely** court stated that its research failed to uncover any cases in which the phrase "sums… justly do" had been interpreted within the context of a surety bond.

contract, and provided further, that after a period of 90 days after the last of work or labor was done or performed, or materials furnished, that a claimant may sue on the bond for those sums as may be justly due the claimant. We rejected the subcontractor's claim for finance charges and attorney's fees under the bond because the bond did not allow for recovery of those items as sums justly due. We found that under the language of the surety bond, it only guaranteed payment for cost of labor and material used. We held that when viewing the language of the bond in question there was no clear indication necessitating a finding that plaintiff was entitled to be paid finance charges and attorneys' fees under that labor and material bond agreement.

By comparison, IFIC's surety bond is not as limited in its language as the bond in **Snavely**. Here, the Payment Bond not once, but twice obligates IFIC to pay a claimant for "all sums due" without reference or limitation to labor, materials and equipment. As we previously stated, a determination as to all sums due must by necessity refer to the Subcontract. Thus, our conclusion here is not inconsistent with **Snavely** and in fact, holds true to the language of the Payment Bond that assures payment for all sums due. **See St. Paul Fire Marine**.

IFIC is bound by the $433,489.42 arbitration award, as confirmed and reduced to judgment, as that award represents the "sums due" Eastern as assured under the Payment Bond. Thus, because IFIC was bound by the amounts established at arbitration, the trial court abused its discretion and committed an error of law in granting IFIC's motion *in limine* precluding

Eastern from introducing and admitting at trial evidence of the arbitration award and the resulting judgment that were conclusive and binding upon IFIC.

*2. Attorneys' Fees*

We next address Eastern's claim that the trial court erred in granting IFIC's motion for partial summary judgment denying Eastern's claim for attorneys' fees under the Subcontract for its efforts to enforce the arbitration award and resulting judgment against IFIC.[31]  Eastern argues that Paragraph 23 of the Subcontract, to which it maintains IFIC was a joint and several obligor, states that "legal fees, and costs of any kind to Subcontractor for non-performance, will be the Contractor's and its sureties [sic] responsibility."

We review a challenge to the entry of summary judgment as follows:

[We] may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion.  As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule.  **See** Pa.R.C.P. No. 1035.2.  The rule [provides] that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered.  Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment.  Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment

---

[31] Eastern abandons on appeal its demand for attorneys' fees under Section 6 of the Payment Bond.  Eastern states in its reply brief that it seeks attorneys' fees only under the Subcontract.  **See** Eastern's Reply Brief at 21-22 ("The issue as to attorneys' fees regarding any failure of IFIC to timely respond is not the issue briefed by Eastern).

as a matter of law. Lastly, we will review the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

**E.R. Linde Const. Corp. v. Goodwin**, 68 A.3d 346, 349 (Pa. Super. 2013) (citation omitted; brackets in original).

"The general rule is that the parties to litigation are responsible for their own counsel fees and costs unless otherwise provided by statutory authority, agreement of parties, or some other recognized exception." **Cher-Rob, Inc. v. Art Monument Co.**, 594 A.2d 362, 363 (Pa. Super. 1991) (citations omitted). Thus, if a recognized exception applies, and the trial court denied a request for attorneys' fees, then this Court will reverse only if the trial court abused its discretion. **See Hart v. O'Malley**, 781 A.2d 1211, 1216 (Pa. Super. 2001).

At the outset, we must distinguish Eastern's entitlement to attorneys' fees incurred to pursue Ionadi's payment obligation under the Payment Bond from its claim to recover attorneys' fees to enforce IFIC's surety obligation to pay the arbitration award and judgment against its principal, Ionadi.

Our holding that IFIC is liable for the contractual interest and attorneys' fees as provided for under Paragraph 23 of the Subcontract and included within the arbitration award, is based upon our conclusion that IFIC, as a surety, is jointly and severally liable to Eastern for "all sums due" for Ionadi's failure to make payment to Eastern. As we explained earlier, this non-limiting language includes those sums due under the Subcontract, because IFIC stands

in Ionadi's shoes as to Ionadi's payment obligation to Eastern. This, however, cannot be conflated with the attorneys' fees incurred to sue IFIC for breach of its obligation to provide payment under the bond. While IFIC is jointly and severally liable to provide payment for Ionadi's payment obligation as per the terms of the Payment Bond, this same obligation does not exist as between Ionadi and IFIC for any default or breach by IFIC, or in simple terms, for IFIC's nonperformance. The Payment Bond assured payment by Ionadi to Eastern. It did not assure against any breaches or defaults by IFIC. If Eastern wanted to include under the Payment Bond "all sums due" to enforce IFIC's surety obligation, it needed to expressly state so in the Subcontract. Had it done so, fees to enforce the surety obligation may have been included within those "sums due" under the Payment Bond.[32]

We find support for our conclusion that Eastern cannot recover its costs and fees to pursue IFIC to fulfill its surety obligation in analogous case law regarding indemnity obligations.[33] In ***Boiler Engineering and Supply Company, Inc. v. General Controls, Inc.***, 277 A.2d 812 (Pa. 1971), we

---

[32] We emphasize again that the amounts due under the Subcontract are included within the amounts assured under the bond, because the bond's reference to assuring payment "for all sums due" Eastern is not limited by any bond language and therefore, the determination of "all sums due" here must be made by reference to the Subcontract. ***See St. Paul Fire Marine***.

[33] Although different, an agreement to indemnify is similar to a surety contract in that an indemnity contract is "an obligation resting upon one person to make good a loss which another has incurred or may incur by acting at the request of the former, or for the former's benefit." ***Potts v. Dow Chemical Co.***, 415 A.2d 1220, 1221 (Pa. Super. 1980).

affirmed the entry of judgment by the trial court in favor of Norina G. Burbage, administratrix of the estate of Edward Burbage, against the Boiler Engineering and Supply Company, Inc. (Boiler), and in favor of Boiler against General Controls, Inc. (General) for indemnification. Edmund Burbage (decedent) was killed when a boiler exploded. The boiler, manufactured by Boiler, contained a valve manufactured by General. Boiler joined General as an additional defendant on the alternative theories that General was liable, jointly or severally to Burbage, or that, in the event Boiler was held liable, General was liable by way of indemnity to Boiler. The jury returned a verdict against Boiler and in favor of Burbage in the amount of $70,000.00 and in favor of Boiler and against General for indemnification in the amount of $70,000.00.

Subsequently, Boiler's insurance carrier paid $12,500 to Boiler's legal counsel for their services in representing Boiler both at the trial and appellate level. Boiler (on behalf of its carrier) then filed a complaint against General for indemnification of reasonable counsel fees and costs incurred to pursue the indemnity obligation owed by General to Boiler. In reversing this Court,[34] our Supreme Court acknowledged that the vast majority of jurisdictions adhere to the rule that a nominal indemnitee may recover attorneys' fees and costs along with the actual judgment against the indemnitor, but only those expenses engendered by the defense litigation and not that portion allocable

_____

[34] The Supreme Court disagreed with our disposition that the fees incurred by the insurance company were not the obligation of the insured and therefore, could not be pursued in a suit by the insured to recover fees against the indemnitor.

to the indemnification litigation may be recovered. The rationale for this rule was artfully stated by the Second Circuit Court of Appeals as follows:

> Indemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify. Consequently, attorney's fees incurred in defending against liability claims are included as part of an indemnity obligation implied by law . . . and reimbursement of such fees is presumed to have been the intent of the draftsman unless the agreement explicitly says otherwise . . . . As stated by the Fifth Circuit, "[t]his rule simply gives effect to the very nature of indemnity, which is to make the party whole." **Such reasoning does not apply to fees and expenses incurred in establishing the existence of an obligation to indemnify, since such expenses are not by their nature a part of the claim indemnified against. Rather, they are costs incurred in suing for a breach of contract, to wit, the failure to indemnify. As such, fees and expenses incurred in establishing the indemnity obligation fall within the ordinary rule requiring a party to bear his own expenses of litigation[.]**

*Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 316 (2d Cir. 1985) (citations omitted) (emphasis added). We find the same logic persuasive here. The fees incurred by Eastern to enforce IFIC's surety obligation are not a part of the amounts assured by IFIC under the Payment Bond to step into Ionadi's shoes to provide payment for Ionadi's payment obligations. The fees now claimed by Eastern are attributable to its efforts to pursue IFIC to establish its obligation for payment of the arbitration award; fees not assured under the Payment Bond. We therefore affirm that part of the trial court's grant of partial summary judgment rejecting Eastern's claim for attorney's

fees incurred to pursue IFIC for breach of its surety obligation to provide payment of the arbitration award. We however, reverse that part of the trial court's judgment denying recovery of attorney's fees to Eastern to pursue Ionadi for all sums due under the Subcontract.

### 3. Interest

Like its claim for attorneys' fees, Eastern argues that it is entitled to the contractually agreed interest rate of 1.5% per month as provided for under Paragraph 23 of the Subcontract on its award against IFIC and that the trial court erred in awarding only the statutory prejudgment rate of interest of 6% per annum. In response, IFIC repeats its position that its liability is dictated by the provisions of the Payment Bond and not the Subcontract, and that it was within the trial court's discretion to determine the amount of time to award the statutory rate of interest.

We reject Eastern's claim that it is entitled to contractual interest under Paragraph 23 of the Subcontract to pursue IFIC for the same reason we concluded Eastern is not entitled to attorneys' fees to enforce IFIC's surety obligation under the Subcontract. The payment terms of the Subcontract may determine all sums due Eastern from Ionadi for which IFIC, as surety, is jointly and severally liable, but the same cannot be said for interest due Eastern to pursue collection of the arbitration award from IFIC for breach of its surety obligations. Rather, Eastern's entitlement to prejudgment interest, as determined by the trial court, is as provided for under 41 P.S. § 202, that provides for 6% interest if a rate is not otherwise specified.

Our review of an award of pre-judgment interest is for abuse of discretion. ***Cresci Constr. Servs., Inc. v. Martin***, 64 A.3d 254, 258 (Pa. Super. Ct. 2013). "A court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others." ***Id.*** at 258 (citing ***Fidelity Bank v. Com. Marine and Gen. Assurance Co.***, 592 F. Supp. 513, 522 (E.D. Pa. 1984) (citations omitted)). The Restatement (Second) of Contracts § 354, which Pennsylvania follows, reflects this discretion:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

***Cresci***, 64 A.3d at 259, citing Restatement (Second) of Contracts § 354(1)-(2) (1981); ***see TruServ Corp. v. Morgan's Tool & Supply Co.***, 39 A.3d 253 (Pa. 2012). "Section 354 distinguishes between interest due on an obligation to pay a definite sum, which is recoverable as a matter of right under Subsection 354(1), and interest on losses incurred *as a consequence* of a breach of a promise to pay, which is subject to discretion under Subsection 354(2)." ***TruServ Corp.***, 39 A.3d at 264-65. Thus, before awarding prejudgment interest, the court must identify the nature of the breach. ***Cresci***, 64 A.3d at 259.

Presently, the trial court exercised discretion and awarded Eastern prejudgment interest against IFIC from May 5, 2010 through May 28, 2015, representing the time from when Eastern submitted its claim to IFIC until the declaration of the mistrial. Although we conclude the trial court applied the correct rate of statutory interest, we are constrained to hold that the court erred in its belief that an award of prejudgment interest and the time for which prejudgment interest would be awarded was discretionary. Eastern's suit against IFIC sought to collect the definite sum awarded Eastern against Ionadi through arbitration, from IFIC, as surety, in the amount of $433,489.42. The nature of IFIC's breach was to pay a definite sum; the arbitration award. The amount awarded Eastern through arbitration was conclusive and binding upon IFIC. The award represents a definite sum under Section 354(1) making interest recoverable from the time payment was due as a matter of right, not within a court's discretion. As a result, because the amount due was fixed and unjustly withheld by IFIC, Eastern was entitled, as of right, to collect prejudgment interest, as damages, on $433,489.42. The trial court erred both in its belief that an award of prejudgment interest was discretionary and in its exercise of discretion to award prejudgment interest for the period May 5, 2010 through May 28, 2015.[35] Eastern was entitled to be awarded prejudgment interest at a rate of 6% per annum from the date of the

---

[35] Were we to conclude the trial court could exercise discretion, we still would find an abuse of discretion because some of the time for which the trial court awarded prejudgment interest included time the arbitrator already awarded contractual prejudgment interest in its arbitration award.

arbitration award. **See Cotterman v. Allstate Ins. Co.**, 666 A.2d 695, 701 (Pa. Super. 1995) (post-judgment interest runs from the date of the arbitration award, not from the date on which the award is confirmed and judgment is entered by a court). We therefore vacate the trial court's award of prejudgment interest and remand for a proper determination of the prejudgment interest amount due.

### 4. Bad faith

Lastly, we address Eastern's claim that the trial court erred in granting IFIC's motion for partial summary judgment on the issue of bad faith. Eastern argues that the term "insurance policy" contained in Section 8371 includes surety bonds.

As we explained earlier, summary judgment is appropriate only when the record clearly demonstrates that there are no genuine issues of material fact, and thus the moving party is entitled to judgment as a matter of law. **Yenchi v. Ameriprise Fin., Inc.**, 161 A.3d 811, 818 (Pa. 2017). When considering motions for summary judgment, trial courts must construe all facts and reasonable inferences from those facts in the light most favorable to the non-moving party. **Id.** In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party and may only grant summary judgment "where the right to such judgment is clear and free from all doubt." **Id.** Appellate courts may reverse a grant of summary judgment only if there has been an error of law or an abuse of discretion. **Id.**

When considering issues of statutory interpretation, the applicable standard of review is *de novo* and our scope of review is plenary. ***Trout v. Strube***, 97 A.3d 387, 389 (Pa. Super. 2014) (citation omitted). In interpreting a statute, this Court is guided by the Statutory Construction Act ("<u>Act</u>") of 1972, 1 Pa.C.S.A. §§ 1501-1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S.A. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." ***Walker v. Eleby***, 842 A.2d 389, 400 (Pa. 2004). Differently put, a statute's plain language generally provides the best indication of legislative intent, and therefore, statutory construction begins with an examination of the text itself. ***A.S. v. Pennsylvania State Police***, 143 A.3d 896, 903 (Pa. 2016). Section 1903(a) of the Act provides:

> Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S.A. § 1903(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." ***In re S.T.S., Jr.***, 76 A.3d 24, 30 (Pa. Super. 2013) (citing to Section 1921(b) of the Act, 1 Pa.C.S.A. § 1921(b)). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa.C.S.A. § 1921(c). Indeed, "[e]very statute shall be construed, if

possible, to give effect to all its provisions." 1 Pa.C.S.A. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S.A. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." **Walker**, 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S.A. § 1922(1).

Section 8371 (bad faith statute), relating to actions on insurance policies, provides:

> In an action arising under an ***insurance policy***, if the court finds that the ***insurer*** has acted in bad faith toward the ***insured***, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371 (emphasis added).

Eastern asks us to construe broadly the term "insurance policy," as set forth in Section 8371, to include surety bonds. As Eastern notes, and we agree, the issue of whether Section 8371 may be extended to sureties has not been addressed by a Pennsylvania state appellate court.[36] IFIC, however,

---

[36] Neither Eastern nor our research reveals any cases in this Commonwealth where a bad faith claim under Section 8371 was applied or upheld against a surety.

urges us to reject Eastern's proposed interpretation of Section 8371. In support, IFIC principally relies upon **Superior Precast, Inc. v. Safeco Ins. Co. of America**, 71 F.Supp.2d 438 (E.D. Pa. 1999),[37] a case decided by the United States District Court for the Eastern District of Pennsylvania. We find the decision persuasive. Like the court in **Superior Precast, Inc.**, we too conclude that the term insurance policy in Section 8371 does not include surety contracts and that, as a result, a party protected under a surety bond, such as Eastern, may not bring a bad faith claim against a surety, such as IFIC.

Preliminarily, we note that Section 8371 contains penal provisions and because of those provisions, it must be construed strictly. **See** 1 Pa.C.S.A. § 1928(b)(1); **see Freeze v. Donegal Mut. Ins. Co.**, 603 A.2d 595, 598 (Pa. Super. 1992) (explaining that "when the statute contains penal provisions, such provisions must be strictly construed.") (citation omitted), **appeal denied**, 615 A.2d 1312 (Pa. 1992). Specifically, as mentioned, Section 8371 provides for punitive damages, attorneys' fees, and award of prime rate plus 3% on the amount of the insurance claim. **See Pavex, Inc. v. York Fed. Sav. & Loan Ass'n**, 716 A.2d 640, 647 (Pa. Super. 1998) (concluding that

---

[37] As indicated earlier, "[w]hile we recognize that federal district court cases are not binding on this court, Pennsylvania appellate courts may utilize the analysis in those cases to the extent we find them persuasive." **Braun v. Wal−Mart Stores, Inc.**, 24 A.3d 875, 954 (Pa. Super. 2011) (citation omitted).

statutes authorizing attorneys' fees are penal in nature and must be strictly construed).

Our General Assembly enacted Section 8371 to curtail certain bad faith acts by insurers. *Ash v. Continental Ins. Co.*, 932 A.2d 877, 885 (Pa. 2007). Section 8371, therefore, formally imposed "a duty of good faith on insurers" based on the General Assembly's "apparent determination that such a provision was necessary to deter bad faith." *Id.* According to the plain language of Section 8371, it applies only "[i]n an action arising under an insurance policy." 42 Pa.C.S.A. § 8371. Our review of the legislative history of Section 8371 reveals that the General Assembly did not engage in any discussions on suretyships or whether it intended to include sureties within the meaning of the term "insurance policy." Indeed, "insurance policy" is not defined in Section 8371. Consequently, we must determine and apply its ordinary meaning and decide whether the meaning is unambiguous and subsumes surety contracts.

To determine the ordinary meaning of "insurance policy," we consult Black's Law Dictionary, which defines the term as "[a] contract of insurance." *Black's Law Dictionary* (11th ed. 2019). The term "insurance" in turn is defined as "[a] contract by which one party (the *insurer*) undertakes to indemnify another party (the *insured*) against risk of loss, damage, or liability arising from the occurrence of some specified contingency." *Id.* (emphasis in original). An insurer is "[s]omeone who agrees, by contract, to assume the

risk of another's loss and to compensate for that loss."[38] *Id.* Relatedly, an insured is "[s]omeone who is covered or protected by an insurance policy." *Id.*

Consistent with the foregoing, our Supreme Court endorsed an understanding expressed by the United States Supreme Court in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 140 n. 19 (1962), wherein the Court noted that "the usual view, grounded in commercial practice, [is] that *suretyship is not insurance*." *Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 614 A.2d 1086, 1099 (Pa. 1992) (emphasis added). As our Sister Court explained:

> Unlike insurance policies, surety bond premiums are not determined by the insurer on the basis of loss but rather on the *lender's* evaluation of risk.[39] Premiums are paid *not by the lenders* but by the investors; they are paid "up-front" and are not subject to adjustment. The instruments have no fixed terms and no right of cancellation or renewal. These factors support the conclusion that the surety bonds are in the nature of commercial guarantee instruments rather than policies of insurance.

---

[38] It is possible for an insurance company to engage in non-insurance activities by providing non-insurance products, such as surety bonds. The mere fact that an insurance company provides non-insurance products does not convert such non-insurance products into insurance products.

[39] A premium to a surety company is the consideration paid to it for certain risks it assumes. It earns that premium as long as the risk is still outstanding.

***Grode v. Mut. Fire, Marine & Inland Ins. Co.***, 132. 196, 213, 572 A.2d 798, 806 (Pa. Cmwlth 1990) (emphasis in original),[40] ***aff'd in part, remanded in part sub nom. Foster***, ***supra***.

Given the ordinary meaning of the term "insurance policy," and our Supreme Court's view that suretyship is not subsumed by the definition of insurance, we must conclude that fundamental differences naturally exist between contracts involving insurance and suretyship.[41]  In this regard, we note that insurance policies are bilateral contracts where an insurer and its insured share a direct contractual relationship, and the understanding of that relationship is that the insurer will compensate the insured for loss or damage upon proper proof of claim and without resort to litigation.  Suretyship contracts, on the other hand, are tripartite in nature where one party, the surety, agrees on behalf of another party, the principal, to make whole a protected party for debts incurred by the other party.  ***See*** 8 P.S. § 1 (providing that all agreements to answer for the debt of another will be

---

[40] Although the decisions of the Commonwealth Court are not binding upon this Court, they may serve as persuasive authority.  ***See Petow v. Warehime***, 996 A.2d 1083, 1088 n. 1 (Pa. Super. 2010) (noting that decisions of the Commonwealth Court may provide persuasive authority and that "we may turn to our colleagues on the Commonwealth Court for guidance when appropriate."), ***appeal denied***, 12 A.3d 371 (Pa. 2010).

[41] As more fully explained below, under Pennsylvania law, a contract that guarantees the debt of another is a suretyship agreement when the creditor is entitled to seek payment directly from the guarantor/surety without being required to first seek payment from the principal debtor.  ***See McIntyre Square Assoc. v. Evans***, 827 A.2d 446, 451 n. 7 (Pa. Super. 2003) (citation omitted).

considered a suretyship unless the agreement specifically states otherwise).

These differences between insurance policies and suretyship contracts also

have been recognized in legal treatises.

> Insurance is the assumption of another's risk for profit. Broadly defined, insurance is a contract by which one party, for a compensation called the premium, assumes particular risks of the other party and promises to pay to such other party or his or her nominee a certain or ascertainable sum of money on a specified contingency. "Insurance" may also be defined as an agreement by which one person, for a consideration, promises to compensate or pay money or its equivalent, or to perform some act of value, to another on the destruction, death, loss, or injury of someone or something by specified perils.
>
> . . . .
>
> A suretyship is a three-party relationship where the surety undertakes to perform to an obligee if the principal fails to do so. The surety stands in the shoes of the principal and must complete any obligation due the obligee at the time of default. In suretyship, the risk of loss remains with the principal while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults.
>
> . . . .
>
> The issuance of a surety bond creates a contractual relationship between the surety and its principal; the contract of suretyship binds the surety absolutely and unconditionally.
>
> . . . .
>
> Suretyship is not generally considered to be insurance. While insurance contracts are in many respects similar to surety contracts, there is a wide difference between the two kinds of contracts—an insurance contract undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event whereas a contract of suretyship is one to answer for the debt, default, or miscarriage of another.

43 Am. Jur. 2d Insurance § 1 (footnotes omitted); 74 Am. Jur. 2d Suretyship §§ 1-2 (footnotes omitted).  As another well-regarded treatise explained:

> The role of the surety is different from that of an insurer because:
>
> 1. The surety bond is a financial credit product, not an insurance indemnity product;
>
> 2. The surety has a "contractual" relationship with two parties that often have conflicting interests, causing the surety to balance these interests when responding to claims;
>
> 3. The surety bond form customarily is written or furnished by the obligee rather than the surety;
>
> 4. The surety customarily is requested to assure performance of construction contracts that are sufficiently large to warrant bonding and typically are entered into by parties with commercial sophistication, relative parity of bargaining power and access to ample legal and technical advice;
>
> 5. The bond premium usually is paid by the contractor to the surety out of the contract price, rather than directly by the obligee to the surety, although it is not uncommon for obligees to reimburse contractors for the premium; and
>
> 6. The pricing of the premium by the surety is not based upon risk of fortuitous loss, but assumes reimbursement to the surety from the principal and indemnitors for any loss.

Philip L. Bruner and, Patrick J. O'Connor, Jr., <u>4A Bruner & O'Connor Construction Law</u> § 12:7 (Westlaw 2021) (footnotes omitted).  As can be seen, suretyship is very different from insurance. Insurers assume risk on the assumption that insurance premiums paid will exceed any loss sustained, whereas sureties attempt to be reasonably certain they will not sustain any

loss. This is reaffirmed by the fact that a surety generally will not issue a bond to a principal unless the principal executes an indemnity agreement to indemnity the surety against any losses the surety may sustain as a result of a claim on a bond.

Thus, applying strict construction and considering the foregoing principles, special damages for bad faith under Section 8371 would be appropriate only in the context of insurance where the parties—the insurer and the insured—share a direct bilateral relationship. *Superior Precast, Inc.*, 71 F.Supp.2d at 451-52. However, a surety such as IFIC and a protected party such as Eastern share no such direct contractual relationship by which IFIC agreed to pay Eastern. *Id.* at 452. Similar to *Superior Precast, Inc.*, here IFIC's relationship was with Ionadi and IFIC had agreed to answer only for those debts to any unrelated party for which Ionadi failed to answer. *Id.* Logically, therefore, special damages would be inconsistent in the absence of a direct relationship between IFIC and Eastern. If our General Assembly had intended to bring about an opposite conclusion, it would have ensured that suretyship was included in the plain language of Section 8371.

Furthermore, Section 8371 is a statutorily-created tort action. *Ash*, 932 A.2d at 885. It applies only in the context of insurance, excluding claims for breach of an ordinary contract, such as surety bonds. *Id.*; *see Superior Precast, Inc.*, 71 F.Supp.2d at 452. This exclusion is commensurate with Pennsylvania law where punitive damages are awarded typically *only in tort actions*. *Ash*, 932 A.2d at 881 (citation omitted). Thus, it would be illogical

to extend a bad faith action to ordinary contracts. Put differently, because a surety stands in the shoes of its principal, and an obligee could not have brought a bad faith claim—attendant with a right to seek punitive damages—against the principal, it follows that such a cause of action also should be unavailable against the surety.[42] Permitting an obligee to recover punitive damages against a surety would expose the surety to greater liability than its principal. This would be incompatible with Pennsylvania law, where "it is axiomatic that the liability of a surety is not greater than that of a principal." *McShain v. Indem. Ins. Co. of N. Am.*, 12 A.2d 59, 61 (Pa. 1940). As the district court in *Superior Precast, Inc.* reasoned:

> [A surety] should not be subject to either a bad faith claim or punitive damages simply because [an obligee chooses] to proceed against it rather than against its principal. The term insurance policy under [Section] 8371 cannot reasonably be construed to include surety contracts, because such a construction would subject [a surety] to greater liability than [its principal] might otherwise have had, in violation of this principal of suretyship law. Further, to hold to the contrary would 1) provide [an obligee] with a windfall based solely on its decision to proceed against [a surety] rather than [the principal] and 2) provide [the obligee] and other parties protected by surety bonds with a financial incentive to proceed against a surety rather than against the principal in attempting to recover for breach of contract. This would be an unreasonable result, one the state legislature presumptively did not intend and one that this court must avoid in construing the terms of [Section] 8371

---

[42] A surety may assert any defense of which his principal could take advantage. *Gen. Equip. Mfrs. v. Westfield Ins. Co.*, 635 A.2d 173, 180 (Pa. Super. 1993) (citation omitted), *appeal denied*, 644 A.2d 1200 (Pa. 1994).

*Id.* at 71 F.Supp.2d at 452-53.  Thus, to apply Section 8371 to sureties would bring about an absurd result and would deviate from the requirement that Section 8371 be strictly construed.  *See* 1 Pa.C.S.A. § 1922(1) (It is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."); *see also* 1 Pa.C.S.A. § 1928(b)(1).

In support of its argument that the term "insurance policy" includes suretyship, Eastern also points out that under the Unfair Insurance Practices Act ("UIPA"),[43] 40 P.S. § 1171.1. *et seq.*, the term insurance policy subsumes suretyship.  *See* 40 P.S. § 1171.3 ("Insurance policy . . . means any contract of insurance, . . . suretyship . . . issued, proposed for issuance or intended for issuance by any person.").  Eastern thus claims that Section 8371 and the UIPA are *in pari materia*.

Statutes are considered to be *in pari materia* when they relate to the same persons or things, and statutes or parts of statutes *in pari materia* shall be construed together, if possible.  ***Allstate Life Ins. Co. v. Com.***, 52 A.3d 1077, 1080–81 (Pa. 2012); *see* 1 Pa.C.S.A. § 1932.  Courts are required, if possible, to give effect to each provision or subsection of the statute.  ***Id.***; *see* 1 Pa.C.S.A. § 1921(a).  The *pari materia* canon of construction is triggered only if the words of a statute are ambiguous.  Our Supreme Court has

---

[43] By way of background, Section 8371 in part was intended to undo the decision in ***D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Inc. Co.***, 431 A.2d 966, 970 (Pa. 1981), where our Supreme Court declined to recognize a private cause of action against an insurer for bad faith under UIPA.

explained that like "all other rules of statutory construction, the necessity of applying the rule as to the construction of statutes *in pari materia* exists only where the terms of the statute to be construed are ambiguous." ***Oliver v. City of Pittsburgh***, 11 A.3d 960, 965 (Pa. 2010) (citation omitted).

Here, as determined earlier, the ordinary meaning of the term "insurance policy" does not include suretyship. Additionally, given the general distinctions between suretyship and insurance, we do not construe as ambiguous the term "insurance policy," "so as to invoke the *in pari materia* canon." ***Superior Precast, Inc.***, 71 F.Supp.2d at 454. The district court in ***Superior Precast, Inc*** aptly explained:

> [W]here a statutory term is specially defined in one statute but undefined in a later statute, a court must assume that the omission was intended by the legislature and that the special definition applies only to the one statute and not to the latter statute.[44] The General Assembly provided in the UIPA a special, broad definition of insurance policy, one expressly including within it contracts of suretyship, but left that term undefined in [Section] 8371. This court will presume that omission was intentional and that the broader definition of insurance policy is limited to the UIPA only. Therefore the ordinary meaning of insurance policy, recognizing the wide difference between insurance and suretyship, controls the construction of [Section] 8371.

***Id.*** (internal citations and quotation marks omitted; footnote added).

Accordingly, upon careful review of the entire record, viewed in the light most

---

[44] Where the legislature includes specific language in one section of a statute and excludes it from another section, the language may not be implied where excluded. ***Fonner v. Shandon, Inc.***, 724 A.2d 903, 907 (Pa. 1999). "Moreover, where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent." ***Id.***

- 68 -

favorable to Eastern as the non-moving party, we agree with the trial court that Section 8371 does not apply to suretyships and, without legislative amendment of Section 8371, we may not reach a contrary result.

B.    *IFIC's Cross-Appeal*

In its cross-appeal, IFIC raises a single issue: whether the trial court erred in interpreting the Subcontract for steel reinforcing material installation services to permit Eastern to recover payment for quantities of this material without introducing evidence of "actual bar weights as shipped."  This issue was part and parcel of the arbitration proceedings which resulted in the $433,489.42 award in favor of Eastern.  Because we already have concluded that this award is conclusive and binding on IFIC, we need not address this cross-claim further.  A common law arbitration award, such as that found in this case, is not reviewable on the basis of error of law or fact by the arbitrator. ***Runewicz v. Keystone Insurance Co.***, 383 A.2d 189 (Pa. 1978).  The setting aside of an award is proper only on a showing of denial of a hearing or fraud, misconduct, corruption, or similar irregularity leading to an unjust, inequitable, or unconscionable award. ***Id.***; 42 Pa.C.S.A. § 7341.  Therefore, IFIC is not entitled to retry this issue in Eastern's separate suit to enforce IFIC's surety obligation.  The determination as to how payment was to be contractually made for bar weight was an issue within the scope of the arbitration that may not now be contested.

### III.  CONCLUSION

In summary, we have concluded that the trial court erred in denying Eastern's motion *in limine* to admit the arbitration award entered in its favor as conclusive and binding upon IFIC as surety to Ionadi in Eastern's action to collect this award against IFIC. The Payment Bond assured payment to Eastern of "all sums due" under its Subcontract with Ionadi. IFIC, as surety, is jointly and severally liable with Ionadi for all sums due Eastern and therefore, was conclusively bound to the arbitration award, as it had full notice and opportunity to participate in those proceedings. While Eastern may recover as part of all sums due attorney's fees incurred in connection with its action against Ionadi, it is not entitled to an award of attorneys' fees to pursue IFIC because the Subcontract did not provide for recovery of fees to enforce IFIC's surety obligation and no other authority exists for recovery of these fees. We further have concluded that the trial court erred in its discretionary award of prejudgment interest to Eastern on the judgment entered on its suit against IFIC. The amount due Eastern, the arbitration award, was a definite sum entitling Eastern to prejudgment interest as of right. Prejudgment interest is to be awarded at the statutory rate of 6% per annum. We further affirm the trial court's entry of partial summary judgment in favor of IFIC concluding that Eastern may not assert a statutory cause of action for bad faith under Section 8371, because that statute does not apply to suretyship contracts. Lastly, IFIC's cross-claim is dismissed as moot in light of our disposition of Eastern's claims.

The judgment of the trial court is affirmed in part, reversed in part, and vacated in part. This matter is remanded to the trial court for proceedings consistent with this Opinion. Jurisdiction relinquished.

Judge Musmanno did not participate in the consideration or decision of this case.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/01/2022